THE STATE, ELEANOR GREEN, PROSECUTOR, v. THE INHABITANTS OF THE CITY OF TRENTON AND THE TRENTON HORSE RAILROAD COMPANY.

1. The provisions of the act (*Rev. Sup., p.* 369, § 30) empowering street railways, with the consent of municipal authorities, to use electric or chemical motors or grip cables as the propelling power of its cars instead of horses, does not legalize the erection of poles and the stretching of wires in a public street as a part of a system of electrical railroading.

2. An ordinance which purports to grant permission to erect such poles and stretch such wires is illegal.

3. An abutter, owning to the middle of a street, can use the writ of *certiorari* to test the validity of an ordinance which purports to confer the power to place such posts upon his land lying in the street.

---

On *certiorari*.

This writ of *certiorari* brings into this court the following ordinance passed by the common council of the city of Trenton :

"A supplement to an ordinance entitled 'An ordinance to authorize the Trenton Horse Railroad Company to construct their road or track through the streets of the city of Trenton,' passed July twenty-sixth, eighteen hundred and sixty-three.

" WHEREAS, application has been made to the common council of the city of Trenton by the Trenton Horse Railroad Company for permission to use electric motors as the propelling power of its cars through the streets of said city ; *and whereas*, the said company has entered into a written agreement with the inhabitants of the city of Trenton not to lay or use in the streets of the city of Trenton any rails not having inside flanges and known as a 'T' rail; and further, that it will, at such time when an extension of the territorial limits of the city shall embrace any streets or roads upon which any such rails shall then be laid (which rails shall be used or controlled by such company in the operating of its railway system) immediately remove the same, and replace them with rails having inside flanges, which agreement is now on file in the office of the city clerk ; now, therefore,

"*The Inhabitants of the City of Trenton do ordain :*

" SECTION 1. That permission be and the same is hereby granted to the 'Trenton Horse Railroad Company' of the city of Trenton to use electric motors as the propelling power of its cars on all of the lines of the city of Trenton which they now or hereafter may control and operate, to be supplied with electricity from properly guarded overhead wires, supported by poles at least twenty feet high, which poles, on Hamilton avenue and on Clinton street, from said avenue to State street, and on State street, from the Assanpink creek to the waste-weir, between Calhoun and Prospect streets, shall be of iron or steel, and along the remaining parts of its lines shall be of dressed and painted cedar, or other suitable wood ;

which poles are to be placed within the curb line, opposite to each other, and connected with steel wires; *provided*, when any of such wooden poles shall be removed or replaced, they shall be replaced with such iron or steel poles.

"SEC. 2. That the location and placing of the poles shall be under the supervision and direction of the city surveyor and the committee on railroads of common council.

"SEC. 3. This permission is granted upon the following terms and conditions:

"1. The poles shall be placed at least one hundred and twenty-five (125) feet apart.

"2. The said company, before commencing the work of constructing their overhead plant, shall present to said committee on railroads and bridges a detailed plan of such construction, the same to be approved by said committee, in writing, before any work is done under the permission hereby granted.

"3. The said company is to maintain gates upon the sides of the platforms of their cars, so that ingress and egress to and from said cars can only be had from the side of the car nearest to the curb. All new cars placed upon the lines of the company shall be of the most approved pattern and, except summer or open cars and tow cars, shall have enclosed platforms.

"4. That the said company shall commence the construction of such electric systems on or before the first day of April next, and complete the same and operate and propel its cars with electricity on all its lines within the city by the first day of April, A. D. 1892.

"5. The said company shall run its cars at such rate of speed, not exceeding twelve miles an hour, as may be required by the common council, and on its branch lines running on State street east of Clinton avenue, and on Hamilton avenue, shall run a sufficient number of cars to make at least thirty (30) round trips daily, at regular intervals.

"SEC. 4. Nothing in this ordinance shall be construed to repeal, alter or modify the agreement referred to in the pre-

amble hereto; but the said agreement is hereby declared to continue in full force and effect.

" SEC. 5. That said company shall pay for the advertising of this ordinance according to law, and this ordinance shall not go into effect until payment for said advertisement shall have been made by said company, and they have filed with the city clerk a written acceptance of the provisions and conditions of this ordinance, executed by them in the manner corporations are required by law to execute such instruments; and a failure to file such written acceptance within sixty days after the passage of this ordinance, shall be deemed and taken to be a refusal so to do on the part of said company, and thereupon all rights and privileges to them hereby granted shall forever cease and be at an end."

The provisions of this ordinance were accepted by the defendants.

The railroad company prepared a detailed plan, showing the location of the various poles which they propose to erect within the curb lines of State street, and one of said poles is to be erected upon the land of the prosecutrix, in State street, within the curb line thereof.

Argued at June Term, 1891, before Justices DEPUE, DIXON and REED.

For the prosecutrix, *William S. Gummere* and *Barker Gummere.*

For the defendants, *Robert S. Woodruff* and *Theodore Runyon.*

The opinion of the court was delivered by

REED, J. The ordinance brought up by this writ is attacked upon the ground that the common council of the city of Trenton did not possess the power to enact it.

The defendants rest their claim that such power existed in the common council, upon the terms of an act of the legislature passed in 1886. *Rev. Sup., p.* 369. The second section

of that act is in the following words : That any street rail-road company in this state may use electric or chemical motors or grip cables as the propelling power of its cars instead of horses ; *provided,* it shall first obtain the consent of the municipal authorities having charge of the public highways or streets on which it is proposed to use such motors or grip-cables.

The question propounded is, Whether by the terms of this act the common council is invested with the power to grant to a street railway company the privilege of placing obstructions in the street in the shape of poles and wires. The counsel for the defendants contend for the existence of this power in the municipal body. The counsel for the prosecutrix, on the contrary, insists that the power of the council is limited to a grant of a permission to use motors upon or attached to the cars, but does extend to a permission to erect structures upon the street, although for the purpose of supplying such motors with the electric fluid.

The canon of construction to be applied to this grant of power is entirely settled. As against the public grantor, the grantee must rely upon express words in the statute or upon a necessary implication. If there exists a doubt as to the extent of the grant or any ambiguity as to its terms, such doubt must be resolved against, and such ambiguity must operate against the grantee in favor of the public. *Bridge Co.* v. *Hoboken,* 2 *Beas.* 81, 94 ; *Delaware and Raritan Canal and Camden and Amboy Railroad and Transportation Co.* v. *Raritan and Delaware Bay R. R. Co. et al.,* 1 *C. E. Gr.* 321, 372 ; *Sund. Stat. Const.,* § 378.

The power conferred is to use electric or chemical motors or grip cables, as the propelling power of cars, instead of horses.

The point to be now ascertained is, what was meant by electric or chemical motors, as those words were employed by the legislature.

To assist in the ascertainment of the import of these words, much testimony has been taken to show the methods by which

electricity was applied in operating railroads at the time of the passage of the act of 1886 ; also to show the progress of electrical railroading since that time; also to exhibit the opinion of experts regarding what was comprehended by the word " motor."

From this testimony it appears that, on March 6th, 1886, the date of the passage of the act under consideration, there were then and had been for five years in operation electric motors, the use of which would be indubitably within the provisions of this act. These motors were placed within the cars. The result of the use of these motors was to discharge the horses from service, and so diminish, instead of increasing, the extent to which the cars had occupied the street. This is known as the storage battery system.

Then there was another system in use in which electricity was not stored in the motor, but was conducted to the motor along a third rail, laid between the two rails upon which the car wheels move. Then there was another similar system, in which the electric fluid was conducted along an insulated wire under ground and communicated to the motor through a slot. It is perceived that the operation of neither of these systems involved the obstruction of the street to an extent greater than before.

Then, about the date of the passage of the act of 1886, there was put in operation a half mile of railroad in Baltimore, by the use of an overhead wire from which the fluid was conducted to the motion-producing apparatus within the car. The overhead wire was supported by poles placed in the street, and so involved an obstruction to the use of the street which had not theretofore existed. This is the trolley system, which the defendants are trying to utilize with the aid of the questioned ordinance.

The use of electricity at the date of the passage of the act of 1886 was in an experimental stage. Indeed, it has not yet, and probably will not for some time, entirely emerge from this condition. So far as electricity had been practically used as a motive power in the propulsion of cars, there is nothing to

indicate that the legislature, from its knowledge of such use, could have intended, when speaking of a motor, anything more than an 'appliance attached to a car by which the electric force was stored or was received and transmuted into motion. There is nothing to indicate that it was intended by the use of the term "electric motor" to include any apparatus outside of the car which would cause an additional obstruction to public travel and an additional inconvenience to the abutting land owners. The views of the experts also make it entirely clear that while, as one witness says, "motor" was sometimes loosely used to designate a whole car, it was never employed to designate anything not a part of the car. Construing this act in the light of the condition of electric railroading in March, 1886, and of the views of the experts, I think it clear that the word "motor" meant the motion-producing contrivance in the car.

But the defendants claim that since the passage of the act of 1886 the relative merits of the several systems have been decisively tested. They claim that the result of these tests is to demonstrate that at the present time the overhead or trolley system is the only scheme which is commercially successful; that it is the only system by which street railroads can be run by electricity more cheaply than by animal power.

I think that it is true that at the present moment the trolley system is the best, and perhaps the only, practicable electrical substitute for horse power. It is uncertain how long this will continue to be true, for scientific inquiry and experiment is astir touching new methods in the use of the electric fluid for railway purposes.

Now, the defendants insist that the grant of power to use an electric motor carries with it, by implication, the privilege of employing such accessories as are necessary to utilize the express grant. Assuming that the overhead or trolley system is the only one by which the use of an electric motor can be made commercially successful, they claim that the right to use this system springs out of the express grant. This is the substance of the defendants' insistence.

Now, I think it true that the express grant did carry with it certain incidental privileges. This is perceived in the grant of power to employ grip cables, which obviously includes the right to change the street between the tracks so as to adjust it to the purposes of cable movement. In like manner, the laying of a third rail, or a wire between the metals, would be regarded as an incidental privilege in operating an electric motor in the methods already mentioned. These would not change the character of the street railroad in respect of the extent of its occupation of the street.

But the claim of defendants goes far beyond this. Their pretension goes to this extent: that if any scheme of supplying electric fluid to electric motors is essential to the economical operation of a railway, then there exists a power to erect any structure which may be a part of such system.

I am unable to take this view of the implied power granted in the act of 1886. It would involve consequences never intended by the legislature. According to this construction of the act, if the erection of an engine-house in a public square, for the operation of cables or the generation of electricity, should be a part of such a system, such structure would be protected by the terms of the statute. If such a system of electrical or cable movement of cars involved the elevation or depression of railway tracks so that the part of the street occupied by the metals would become useless for ordinary travel, this would also be within the protection of the act. If the scheme included the construction of a solid wall along the tracks, or the entire exclusion of any passageway between the sidewalks and wagonway, it would be validated by the act. It seems too obvious for argument that the legislature had no intention to grant privileges so extensive and burdensome as these. But if the term motor is to be held to include posts, arms and wires in the street, or if it be held that the right to use a motor impliedly carries with it the right to employ these posts, arms and wires, it would seem difficult to define what obstruction in a street might not be legalized by this act.

I think it clear that it was never within the legislative design, expressly or by implication, to empower a private corporation to change, or to grant power to a common council to permit such corporation to change, the character of a street railroad.

I mean by the term, "character of a street railway," its methods of using a public street, as such use has heretofore been recognized.

The placing of the tracks level with the surface of the street, the distance between the rails, the location of the rails in the street, the condition of the street between the rails, have always been carefully regulated so as to present practically no interference with the use of the entire street for all kinds of vehicles. It is because of this feature of street railways that their occupation of a street, as distinguished from that of steam railways, have been held to be but a modification of the ordinary use of streets by vehicles. It was this characteristic that was recognized by Chancellor Green as the ground of decision in the case of *Hinchman* v. *The Paterson Horse R. R. Co.*, 2 *C. E. Gr.* 75, 80.

The Chancellor alludes, in his opinion in that case, to these material facts: that the road was required to be laid level with the street; that there was no embankment or excavation; that the use of the road was nearly identical with that of the ordinary highway and the motive power was the same. It was upon the ground of similarity of uses by a street railway and ordinary vehicles, that the railroad company in that case evaded an injunction.

Now it should require the clearest expression of the legislative intention to warrant a claim by one of these corporations, that it possesses the prerogative of permanently depriving the public of the use of an inch of the public highway. Not only is there an absence of such an expression of intent, but there seems to be manifested in the form of the grant of power an adverse purpose. The grant is of power to substitute motor for horses. It seems to indicate that while horses need not be used, but another motive power may be applied, yet the

road shall in all other respects retain its character.    It would seem to exclude the notion that a company can erect obstructions in a public street, which obstructions are antagonistic to the ordinary use of the street and strange and novel in the operation of a horse railroad.

But it is to be finally remarked that the implication of the grant of this power is not a necessary one, for an electric motor may be operated, as we have shown, without street obstruction.

And in respect of the trolley system itself, it is to be observed that while the erection of posts is essential to the successful operation of the system, nevertheless the location of posts in a public street is not necessary for its operation. Posts placed upon private property adjoining the street will subserve the purposes of the system.    This involves a difference in expense and trouble, but involves no radical obstacle to the successful operation of the electric motors.

The conclusion is that the act of 1886 expressly grants only a right to use, with the consent of the municipal authorities, an electric machine attached to some part of a car for the purpose of transmitting electric energy into car movement. The act contains no implied grant of power to obstruct the ordinary use of a public street by posts, wires or any other apparatus designed to be used in connection with any electric motor.

The common council had no power to authorize or consent to anything more than to the use of an electric motor.    The ordinance pretending to vest, as it does in the defendant corporation, a right to place posts and string wires in the public streets, is a nullity.

It is perceived that this result does not rest upon the want of power in the legislature to authorize these erections upon the land of an abutting owner, without providing compensation, upon which question no opinion is expressed, but rests upon the intention of the legislature as expressed in the act.

The defendants insist, however, that the prosecutrix has no standing from which she can attack this ordinance by the use

of the writ of *certiorari.* I think that she has. Unless these poles are to be placed in their intended position by some one having authority to do so, they will constitute a nuisance. Inasmuch as the prosecutrix owns the fee to the middle of the street, such an erection will also be a trespass. *Winter* v. *Paterson,* 4 *Zab.* 524; *Wuesthoff* v. *Seymour et al.,* 7 *C. E. Gr.* 66, 70; *State* v. *Laverack,* 5 *Vroom* 201, 208; *Waterm. Tresp.,* §§ 698, 699.

The execution of the project which this ordinance professes to authorize involves a special injury to the prosecutrix, and she is not bound to await its accomplishment. She has the right to anticipate this injury by testing the legality of the ordinance which professes to confer the right to inflict it. *State, Danforth, pros.,* v. *Paterson,* 5 *Vroom* 163; *State, Gregory, pros.,* v. *Jersey City, Id.* 390; *State, Bodine, pros.,* v. *Trenton,* 7 *Id.* 198.

This ordinance is set aside.