THE MAYOR AND ALDERMEN OF JERSEY CITY, DEFENDANT IN ERROR, v. JAMES P. HALL, INCORPORATED, AND THE CENTRAL RAILROAD COMPANY OF NEW JERSEY ET AL., PLAINTIFFS IN ERROR.

Argued March 9, 1910—Decided June 20, 1910.

1. The act approved April 4th, 1872 (*Pamph. L., p.* 1356), evinces the legislative intent to impose the duty of regulation and supervision over the lands ceded as well as the basin dedicated thereby upon the city of Jersey City.
2. A legislative intention clearly expressed in a special act will persist over any implication which can be gathered from a general act, where both acts were approved contemporaneously.

3. The twentieth section of "An act for the limitation of actions" (*Gen. Stat., p.* 1978) is not a bar to an action of ejectment instituted by public authority or by the state for the recovery of lands of the state covered by tidewaters.

On error to the Supreme Court.

For the plaintiffs in error, *Richard V. Lindabury, George Holmes* and *William D. Edwards.*

For the defendant in error, *James J. Murphy* and *Warren Dixon.*

The opinion of the court was delivered by

VOORHEES, J. This is a writ of error to the Supreme Court to review a judgment directed for the plaintiff, the mayor and aldermen of Jersey City, in an action of ejectment.

The defendant, James P. Hall, Incorporated, was a tenant under a lease from the defendant, the Central Railroad Company, dated October 7th, 1906, for that portion of the *locus in quo* specially described in its plea.

The premises, a recovery of which is sought, constitute a portion of the tidewater basin which is particularly described in the fifth section of chapter 596 of the laws of 1872 (*Pamph. L., p.* 1356), which portion may be generally and shortly described as a strip of land three hundred feet in width, lying immediately in front of the tract granted to the plaintiff by section 1 of said act. The declaration alleges that the plaintiff's right to possession accrued March 4th, 1885.

The trial justice directed a verdict for the plaintiff against all the defendants.

At the close of the plaintiff's case a motion to nonsuit was made upon the grounds that the plaintiff had failed to show title, and to show any right to exclusive possession, and also had failed to show that it was charged with any duty with respect to the premises, which required for its performance the exclusive possession thereof. This motion was denied.

At the conclusion of the whole case the defendants requested a direction of a verdict in their favor because it appeared that

as to a part of the *locus in quo,* the defendant, the Central Railroad Company, had been in possession since before 1872, and as to all the *locus in quo* a direction was asked because of a grant by the riparian commissioners to the railroad company, on November 12th, 1874, passing to it a good and indefeasible title and also, for the reasons put forth in support of the motion to nonsuit, a like direction was asked for so much of the *locus in quo* as had been filled in, reclaimed and occupied by the railroad company before the year 1872 upon the ground (*a*) that by such acts of filling in and reclamation it had acquired title to such portion under the local common law; (*b*) and had also acquired title to such portion by adverse possession under the statute of limitations of New Jersey. These motions were refused. Thereupon the plaintiff requested a direction of a verdict in its favor, which the court granted, and judgment has been entered upon such verdict.

Exceptions being sealed to the judicial action upon these various motions, the errors assigned thereon form the basis for the review of the judgment.

The first point made by the plaintiffs in error relates to the weakness or lack of title of the city. It is asserted that no title nor any right to the exclusive possession of the *locus in quo* has been shown to be in the city.

It is conceded by the defendants that an implied right exists in a municipality to regulate the use of streets and parks within its corporate limits (*Price* v. *Plainfield,* 11 *Vroom* 608), which gives it the right to maintain ejectment for encroachments upon the highways, because the public easement is such that exclusive possession is essential, free from interference by the owner of the fee, to a proper regulation and improvement of the highways. *Borough of Chambersburg* v. *Manko,* 10 *Id.* 496.

But they deny that this authority of the city exists by implication over the public waters within its confines, and insist that if such authority is invoked, it must appear to be conferred by express enactment.

The following are some of the authorities cited for this position: *Allen* v. *Freeholders,* 2 *Beas.* 68, that special power

must be conferred by the legislature to erect bridges over navigable rivers; and generally, *Commonwealth* v. *City of Roxbury,* 9 *Gray* 451; *Inhabitants of Marblehead* v. *County Commissioners of Essex,* 5 *Id.* 451; *Winpenny* v. *Philadelphia,* 65 *Pa. St.* 135, 140; *People* v. *Jessup,* 51 *N. Y. Supp.* 228.

They also insist that in New Jersey the sole power to regulate such waters as those in controversy is vested in harbor masters and inspectors by the act of March 31st, 1869 (*Gen. Stat., p.* 2320), and by act of March 30th, 1875 (*Gen. Stat., p.* 2322), their jurisdiction is extended to Hudson county, instead of to the cities of Jersey City and Hoboken.

Without passing upon these objections it will be necessary first to examine the act of 1872 above cited to ascertain whether the power of superintendence and control has not been conferred thereby upon the municipal authorities.

This act was a grant of certain premises to Jersey City, for a public use, and a dedication of certain adjoining land, in which is included the *locus in quo,* to public use, for a tidewater basin.

The above qualities of the act, as well as its constitutional validity with respect to its title, have been passed upon by the Supreme Court (*Easton and Amboy Railroad Co.* v. *Central Railroad Co.,* 23 *Vroom* 267; *Jersey City* v. *American Dock and Improvement Co.,* 25 *Id.* 215), and with the results therein reached we concur.

The fifth section of the act reads as follows: "And be it enacted, that there shall be established, adjacent to the lands hereinbefore described and granted, a tidewater basin embracing all that tract of land under water described as follows:"

Here follows a description of the lands by metes and bounds.

"That the above tidewater basin in this act described shall be and remain and the same is hereby dedicated as and for a tidewater basin; and owners of any land which shall adjoin the said tidewater basin, their successors, heirs and assigns may charge wharfage, dockage and other charges incident to the use of wharves; and it is hereby declared that this provision shall have the effect of a contract so that the said tidewater basin shall be and remain such forever; but so the

said tidewater basin shall be dredged and kept in order without expense to the state."

It will be noticed by reading the preamble that this act was passed because Jersey City was without public docks, and hence that Jersey City was designed to have the benefit of the enactment. The defendants would have us conclude that neither the city, nor any property owner, was designed to have an exclusive control over the basin, although they concede that the last clause of section 5 indicates that the shore owners, if they desire to make a beneficial use of the basin, must defray the expense of dredging and keeping it in order.

It was the clear intention that someone should relieve the state of the expense of caring for it.

That this should devolve upon shore owners, who might or might not conclude to build wharves and charge wharfage, is not to be supposed was the legislative purpose, if by a reasonable construction of the act this important, constantly recurring necessary and continuing duty of dredging and keeping it in repair can be placed upon a definite and responsible agency, such as the city for whose benefit the enactment was made.

The second section of the act gives to the city "full control and regulation of the basin and wharves and land conveyed to them." The title of the act is "An act to cede to the mayor and common council of Jersey City, certain lands of the state now and heretofore under the tidewaters of Communipaw bay and to establish a tidewater basin adjacent thereto."

The word "basin," as first used in the second section of the act, may well refer to the basin mentioned in the title. The double use of the conjunction "and" in this section grammatically would so indicate, and that construction serves to provide the party, with which the state has assumed to contract, which it has sought to benefit; and upon which, in consequence of such benefit conferred, it has equitably imposed the burden of the expense of dredging and repairing.

The fact of the adjacency of the tidewater basin to the basin ceded must not be overlooked. The one forms an en-

trance to the other, and they are evidently designed to be used in conjunction with each other. That the control of the one should be invested in the municipal corporation, while the state, divesting itself of authority over the other, leaves undefined, who may exercise such authority, or at best confers this oversight upon those who may happen to become wharf owners, would be a construction too irrational to attribute to so important a function and should not prevail if by a comprehensive view of the whole act the more fitting intent can be gathered to impose the duty of regulation and supervision over the entire system upon a single proper and responsible custodian, the city.

We think that such intention is manifest and that it is manifested by this legislative scheme that the control as well as the expense of maintenance of the tidewater basin was imposed upon Jersey City, and therefore that the action is well brought by the city.

It is next argued that the riparian grant of November 12th, 1874, was effectual to vest in the Central Railroad Company the title to the *locus in quo* and to extinguish whatever public easement therein was created by the above act of April 4th, 1872.

On the same day upon which the above act was approved, there was also approved a supplement to the General Riparian act of 1864. *Gen. Stat., p.* 2790. The preamble to this general act recites the recommendation of the riparian commissioners that some changes be made in the line for solid filling, and to enable them to make the proposed changes and "to provide additional wet basins in the same," enacts that the commissioners may "make any changes in any basin now fixed and established." Under the power which the defendants assert had been vested in the riparian commissioners by this act, the commissioners, on September 17th, 1874, executed a paper, which after reciting, that pursuant to the act of cession of 1872, they "did reduce to writing a description of so much and such parts of said lands as were designated in said act for the purposes therein mentioned and file a map and description thereof in the office of the secretary of

state," &c., * * * "and did fix and determine a certain sum of money and terms of payment as proper and equitable compensation to be paid by said city to the state for said cession, and whereas the said city" * * * "have on their part failed to comply with the terms and conditions so fixed and determined, and with the requirements of said act, and whereas the interests and convenience of the state and of the riparian owners render a change in such tidewater basin desirable," therefore the commissioners made certain changes in the tidewater basin by fixing the lines for the northerly boundary of the basin, three hundred feet more southerly than the original boundary line thereof and vacating all such parts of the basin lying northerly of said new boundary, thus reducing the basin from a width of five hundred feet north and south, to a width of two hundred feet, and they further vacated the entire cession which had been made to the city by the act of 1872 by the same description as contained in said act.

While it may be doubted whether the commissioners under the power claimed by them "to make any change in any basin" could wipe out a cession because of alleged failure on the part of the city to comply with the terms of the grant, for this grant executed itself, and the city could not decline to accept it, and no one but the state could repudiate or recall it (*Easton and Amboy Railroad Co.* v. *Central Railroad Co., supra*), yet it is not necessary to pursue this inquiry further in view of the conclusion arrived at on this branch of the case.

Although the statute of cession declared that the act should have the force of a contract, manifestly in an endeavor to secure it against impairment by any subsequent legislation, yet such grant, between a state and a municipal government, is not within the protection of the federal constitution, for neither a grant of legislative power, nor an act regulating the use of property held by it for public purposes, is a contract. *Covington* v. *Kentucky,* 173 *U. S.* 231. And so, also, the cases in our state have held, the only exception being in favor of the rights of creditors. *Rader* v. *South Easterly*

*Road District,* 7 *Vroom* 273; *New Brunswick* v. *Williamson,* 15 *Id.* 165; *S. C., affirmed,* 17 *Id.* 204; *re-affirmed, sub nom. Williamson* v. *New Jersey,* 130 *U. S.* 189; *Cortelyou* v. *Anderson,* 44 *Vroom* 427.

It may therefore be conceded that no direct strength is added to the city's position by the use of the word "contract" in the act. But a dedication is equivalent to a grant. *Hoboken Land and Improvement Co.* v. *Hoboken,* 7 *Vroom* 547.

This statement, nevertheless, together with the declaration that the basin shall remain forever, is useful as evincing the legislative intent that an act, general in its character, passed simultaneously with it, shall not be deemed to detract from the force of the act which has so clearly declared that the subject of the special act shall not be destroyed but shall remain.

An intention so clearly expressed in a special act will persist over any implication which can be gathered from a general act, where both acts were approved contemporaneously; and construing both acts together, it is plain that the general act must be held to refer to basins previously established. *State, Bartlett, pros.,* v. *Trenton,* 9 *Vroom* 64.

It follows then that the commissioners had no power to vacate part of the tidewater basin as they attempted to do.

Following this act of vacation, the riparian commissioners, on November 12th, 1874, attempted to grant to the Central Railroad Company the *locus in quo,* being the portion of the tidewater basin above vacated. It is, of course, patent that as the statute in question did not confer upon them the power to vacate the basin and so relieve it from the contemporaneous dedication or grant, it was beyond their functions to convey what had thus been put beyond their power, and by its unrevoked dedication had, been withdrawn from their jurisdiction. *American Dock and Improvement Co.* v. *Trustees,* 12 *Stew. Eq.* 409 (at *p.* 441).

This brings us to the last point made by the defendants. It is that the Central Railroad Company has a good title by adverse possession to the bulkhead or crib constituting the

portion of the *locus in quo* in which its railroad is constructed.

The contention is founded upon the fact, that before the dedication made by the act of 1872, *supra,* the railroad had built a crib work, wholly below water mark, whereon their present railroad was constructed and now is located.

The twentieth section of "An act for the limitation of actions" is invoked as a bar.  *Gen. Stat., p.* 1978.  It reads as follows:

"That no person or persons, bodies politic or corporate shall be sued or impleaded by the State of New Jersey for any lands, tenements or hereditaments, or for any rents, revenues, issues or profits thereof, but within twenty years after the right, title or causes of action to the same shall accrue, and not after."

This is an old statute, passed originally in 1799, and has remained on the books without change to the present time. Whether, when the legislature enacted it, they had in contemplation lands under tidewaters, inasmuch as at that date it had not yet been settled that such lands were owned by the state, need not for present purposes be discussed as a basis for an argument that the act is inapplicable, a principle of construction hinted at in the opinion of Mr. Justice Reed in *Green* v. *Trenton,* 25 *Vroom* 92 (at *p.* 100).  There were at that date lands held by the state under conveyances for the purposes of government and for its public institutions; lands acquired by foreclosure, and yet others that need not now be specified, which would be appropriately affected by this statute.

It refers to actions by the state, and does not in terms apply to the case *sub judice.*  This action is by the city, a branch, it is true, of the state government, but not within the letter of the enactment.

The argument is that, if the statute can be pleaded against the state, it must follow that it may be pleaded against the city which represents the state and can assert the latter's right.  We may assume, without deciding, that this position is correct.

The postulate that the title to lands under navigable waters and to the waters thereon, ebbing and flowing with the tide, is held by the state as *proprietor,* and not by it in its *sovereign right* for the public, is a necessary substratum, upon which to build the argument of the defendants. They have freely conceded this to be so, and assume that the lands are held by the state as a proprietor, not as sovereign, and dismiss the subject by saying that the proposition will not be disputed since it was so declared by this court in *Hoboken Land and Improvement Co.* v. *Hoboken,* 7 *Vroom* 540 (at *p.* 551), and by the Supreme Court of the United States in the review of the same case. 124 *U. S.* 681.

The declaration alluded to is in the following words:

"That public right is entirely distinct in its essential qualities, from the title of the state in lands under tidewaters. The former inheres in the state in its sovereign capacity. The latter is strictly proprietary. A grant of the proprietary title will never operate as a release or extinguishment of a sovereign right not necessarily included within the scope of the grant. *The State, Morris Canal and Banking Co., pros.,* v. *Haight,* 7 *Vroom* 471.

"The grant to the defendants comprised the valuable privileges of acquiring title to lands under the waters, along their entire frontage on the river. The public easement is legally consistent with title to the soil in a private owner, and the legislative intent to vest the proprietary title in the defendants will have legal effect without extinguishing the public right of access to the river, derived from the original dedication. Where two public rights of different origin, distinct in their nature, and capable of a separate enjoyment, exist, a grant of the one will not extinguish the other, unless required by clear and unequivocal language. The cardinal rule of construction is the inquiry whether the legislative gift can take effect without drawing to it the additional right claimed. If it can, the latter is, by operation of law, excluded from the grant. *Paterson and Newark Railroad Co.* v. *Stevens,* 5 *Vroom* 532."

It is deemed necessary to examine the character of the

ownership of the state, whether, as asserted by the defendants, it is proprietary in the sense contended for, or whether sovereign for the people, or whether combining both qualities. If it be found that the state holds these lands as sovereign it will be subversive of the defendants' argument reared thereon.

Before, however, proceeding to do so, it may be remarked that for the purposes of this case, certain propositions may be admitted without expressing any opinion as to their legal existence.

It may be admitted that if the statute is once put in motion, it will persist in its course against the state as it does against an individual, over all obstacles; that this course was not arrested by the dedication in the act of 1872 of the basin.

We return then to the subject under consideration, at the point of this digression. The early kings of England were accustomed to grant the public lands, including those under tidewaters absolutely to private individuals, claiming ownership as the proprietor. So this continued until Magna Charta, after which such waters were held for the common use of the people. This limited the arbitrary power of the sovereign, but did not interfere with his right to convey the land covered by the water. But later the power of parliament was increased, of which Sir Edward Coke says (4 *Inst.* 36):

"The power and jurisdiction of parliament is so transcendent and absolute that it cannot be confined either for causes, or persons within any bounds." See, also, 1 *Bl. Com.* 160.

Under this power, the king's authority was abridged and he lost the right to convey by private grant these lands. The power to do so thence resided in parliament. See *Freeman Growth Eng. Const.* 140. See remarks of Blackstone as to the laws for ascertaining, limiting and restraining the royal prerogative passed from the Petition of Right in 3 *Car.* 1 to the time of his writing. 1 *Bl. Com.* 334.

As an inheritance from the mother country after the revolution, the dominion of the king, as well as the power of

parliament, descended upon the states of the republic, and was united in the legislature. *Wooley* v. *Campbell,* 8 *Vroom* 163.

The cases seem to accord with this general résumé. The Lord Chancellor (Lord Westbury), in *Gann* v. *Free Fishers of Whitstable,* 11 *H. L. Cas.* 192, says:

"The bed of all navigable rivers where the tide flows and reflows, and of all estuaries or arms of the sea, is by law vested in the crown. But this ownership of the crown is for the benefit of the subject and cannot be used in any manner so as to derogate from or interfere with the right of navigation, which belongs by law to the subjects of the realm."   *   *   *
"Anterior to Magna Charta, by which such grants were prohibited, a several fishery in an arm of the sea or navigable river might have been granted by the crown to a subject."
*   *   *   "But this, like every other grant, whenever made, must have been subject to the public right of navigation."

This subject has received consideration by this court in *Stevens* v. *Paterson and Newark Railroad Co.,* 5 *Vroom* 532. In that case, with his usual clearness and force, Chief Justice Beasley, in a learned opinion, says:

"It is entirely indisputable that the proprietors of New Jersey did not, under the grant from the Duke of York, take any property in the soil of navigable rivers within the ebb and flow of the tides. This was the very point of decision in *Arnold* v. *Mundy,* 1 *Halst.* 1; *Martin* v. *Waddell,* 16 *Pet.* 367, and *Den ex dem. Russell* v. *Associates of Jersey Company,* 15 *How.* 426. Second, that this title to the soil under navigable water, which the common law of England placed in the king, was transferred by the revolution to the people of the state."

Again, in the same case (at *p.* 549), it is said:

"All navigable waters within the territorial limits of the state, and the soil under such waters belong in actual propriety to the public."

It seems that this last sentence is used to indicate the supreme power of the people over this species of property, by which the legislature has come to possess the right to grant it absolutely freed from any right whatsoever. For it appears in that part of the opinion where the power of the legislature

to convey is being treated, and not in connection with any discussion distinguishing between a proprietorship in the state and the state's sovereignty. The whole trend of this case is that lands under tidal waters are not held by the state as a proprietor, at least not wholly so, but are held for the benefit of the public.

It would seem that the Supreme Court of the United States, in *Hoboken* v. *Pennsylvania*, 124 *U. S.* 656, so understood the law of this state, and the purport of *Stevens* v. *Paterson and Newark Railroad Co., supra.* Mr. Justice Matthews therein says:

"In the examination of the effect to be given to the riparian laws of the State of New Jersey by the act of April 11th, 1864, in connection with the supplementary act of March 31st, 1869, it is to be borne in mind that the lands below high-water mark, constituting the shores and submerged lands of the navigable waters of the state, were, according to its laws, the property of the state as sovereign."

And again:

"The nature of the title in the state to lands under tide-water was thoroughly considered by the Court of Errors and Appeals of New Jersey in the case of Stevens *v.* Paterson and Newark Railroad Co."

And cites, as confirmatory, that portion of the opinion in that case above quoted.

In *Newark Aqueduct Board* v. *Passaic*, 18 *Stew. Eq.* 397, Chancellor McGill said:

"It is well established that the title to navigable tidewater and to lands under it, is in the state for the support of rights therein, which are common to the entire public," citing the Stevens case. Vice Chancellor Grey, in *Amos* v. *Norcross*, 13 *Dick. Ch. Rep.* 256, says:

"The final determination of our highest court has declared that the proprietors of New Jersey never received by the grants from the Duke of York any property in the soil of the navigable waters of the state lying within the ebb and flow of the tide, and that the title of the state as sovereign is absolute."

And, again, in *Simpson* v. *Moorhead,* 20 *Dick. Ch. Rep.* 623, he says (at *p.* 628) :

"Some of the principles laid down by the defendant's counsel, regarding such lands, are indisputable.   One of them is that the State of New Jersey was, in its right as sovereign, the owner of all that belt of land lying at high-water mark within tidal waters of the state, and thence out into the sea or river, so far as there can be any ownership of lands."

So, this court in *Marcus Sayre Co.* v. *Newark,* 15 *Dick. Ch. Rep.* 361, speaking by Mr. Justice Dixon, after citing the Stevens case, with reference to tidal navigable streams, continues :

"As no private property exists in such waters, there remain only the *jura publica,* over which, in the words of the Chief Justice, the dominion of the legislature appears to be unlimited."

In *Illinois Central Railroad* v. *Illinois,* 146 *U. S.* 387, it is likewise held that the bed or soil of such waters is held by the people of the state in their character as sovereign in trust for public uses, and that, because so held, this public interest cannot be relinquished by a transfer of the property.

It seems therefore to be conclusively shown that the state holds the title to the shore and the lands below high-water mark in the right of its sovereignty and for the benefit of the public.

In *Hoboken Land Co.* v. *Hoboken, supra,* this court held, speaking of the public right, that it "is entirely distinct in its essential qualities from the title of the state in lands under tidewaters.   The former inheres in the state in its sovereign capacity; the latter is strictly proprietary.*   A grant of the proprietary title will never operate as a release or extinguishment of a sovereign right, not necessarily included within the scope of the grant.   The public easement is legally consistent with the title to the soil in a private owner."   *   *   *
"Where two public rights of different origin, distinct in their nature and capable of separate enjoyment, exist, a grant of one will not extinguish the other, unless required by clear and unequivocal language.   The cardinal rule of construction is

the inquiry whether the legislative gift can take effect without drawing to it the additional right claimed. If it can, the latter is, by operation of law, excluded from the grant."

It cannot be doubted, therefore, that the state in its sovereign capacity holds these lands, and they are *publici juris*. Whether they are held in propriety also, as they were by the king, may not now be decided. The case last cited would so indicate. Where in *Wooley* v. *Campbell,* 8 *Vroom* 163; *Paul* v. *Hazleton, Id.* 106; *State* v. *Post,* 26 *Id.* 264 and *Simmons* v. *Paterson,* 15 *Dick. Ch. Rep.* 385, the title is said to be "proprietary," "absolute," these words are used to convey the idea that it was within the power of the state to grant all its interest, both public and private, as was clearly shown in the Stevens case.

Whether, therefore, we regard the state's holding as entirely for the benefit of the people, or in a dual capacity will be equally destructive of the defendants' case. If the former, then admittedly the defendants cannot avail themselves of the statute; if the latter, then the situation is not different from public streets in which the private right is in the abutting owner and the public right in the people, and as it is said in *Hoboken Land and Improvement Co.* v. *Hoboken, supra:*

"The ownership for all substantial purposes is in the public. Nothing remains in the original proprietor but the naked fee, which, on the assertion of the public right, is divested of all beneficial interest."

The structure built by the defendant, which is said to have transferred the possession of the *locus in quo* to the defendants, affected not only the proprietary right, but the public right as well. It is not unlike an obstruction placed in a highway. If it could work against the title to the abutting owner, still it would not bar an action by the public under its right to regulate and care for the highway. It is the public right alone with which the writ in this case deals. It is the public possession which is sought to be recovered. Hence, it is not perceived how the present case differs in principle from that set forth in *Cross* v. *Morristown,* 3 *C. E. Gr.* 305, where

in his argument, the Chief Justice, sitting as master, significantly asks:

"Who is to watch, for example, so as to detect within a certain period all encroachments upon the innumerable public highways in the state, or who is to keep similar guard over all parts of its extensive harbors and navigable rivers?"

The statute, which was in force at the time of this decision and is now invoked, must be held to be no bar to an action of ejectment instituted by public authority or by the state for the recovery of lands of the state covered by tidal waters.

The judgment of the Circuit Court is affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, GRAY, DILL, JJ.    12.

*For reversal*—None.